IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES WILKERSON, a.k.a.,
ADONAI EL-SHADDAI,

      Plaintiff,                    No. CIV S-06-1898 FCD EFB P

  vs.

B. WHEELER, et al.,                  FINDINGS AND RECOMMENDATIONS

      Defendants.
_____/

Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983. Currently pending is the motion for summary judgment filed on behalf of defendants Albonico and Wheeler.

This action proceeds on the June 13, 2006, complaint in which plaintiff claims that defendants Albonico and Wheeler attacked him and restrained him in retaliation for plaintiff's exercise of his First Amendment rights and that this attack constituted an excessive use of force in violation of the Eighth Amendment. Compl., at 2-3. Defendants seek summary judgment only on the retaliation claim. For the reasons explained below, defendants' motion must be denied.

////

1

**I.  Facts**

At all times relevant to this action, plaintiff was a prisoner at High Desert State Prison ("HDSP").  Defs.' Mot. for Summ. J., Stmt. of Undisp. Facts in Supp. Thereof ("SUF"), SUF 1. Defendants Wheeler and Albonico were guards at HDSP assigned to Search and Escort ("S&E"). Defs.' Mot. for Summ. J., Docs. Lodged in Supp. Thereof ("Pl.'s Dep."), Pl.'s Dep., at 27.  Also during the time relevant to this action, HDSP was on lockdown.[1]  *Id.* at 19.

Defendants' motion addresses prison procedures related to inmate access to supplies necessary to file documents in the courts and physical access to the law library during a lockdown.  For large packets of paper to be stapled, prisoners were allowed to use an industrial stapler, which was located in the Program Office.[2]  Pl.'s Dep., at 24.  While a large "industrial" stapler used to be kept in the law library, at some point prison officials moved it to a location where prisoners did not have free access to it after a prisoner used part of it to make a weapon.[3] *Id.*  Because of the lockdown, the only way prisoners could go to and return from the law library or the program office was to be escorted, usually by officers assigned to S&E.  *Id.* at 28.  When returning prisoners to their cells, the S&E guards ordinarily would enter the law library and escort whoever is ready to leave and volunteers to go at that time.  *Id.* at 28, 29.  Prisoners were not at liberty to go to the Program Office of their own free will.  *Id.* at 28.  Plaintiff concedes that he knows of no policy that requires S&E officers to take prisoners to use the stapler, but asserts that they did it anyway.  *Id.* at 27, 28.

---

[1] "Lockdown means that a portion of the facility is affected by suspension of required programs or services, and inmates are not released except as determined by the facility administration on an individual, case-by-case basis.  As determined by the facility administration, under such circumstances only critical inmate workers in the affected housing units/sub-facilities will be permitted to attend to work assignments under escort, and all but essential functions are suspended in those affected housing units or sub-facilities, e.g., yard, canteen draws, religious services, and visiting." Cal. Code Regs. tit. 15, § 3000.

[2] It is not clear what the nature and purpose of this office is.

[3] No further details about when and why the stapler was moved appear in the record, but these facts are not relevant to plaintiff's claims.

2

On May 18, 2005, plaintiff was scheduled to have time in the law library in order to comply with a filing date in the United States Supreme Court. Pl.'s Dep., at 17. Although his time in the library was to begin at 12:30 p.m., no one arrived to escort him until 2:50 p.m., which is about 15 minutes before the library was to close.[4] *Id.* at 18, 23. From the time he left his cell, plaintiff was restrained by waist-chains. *Id.* at 28. Thus, there was a chain around his waist to which his handcuffed hands were attached by a six-inch chain. *Id.* at 38. Wheeler and Albonico were standing in front of the library door when he arrived. *Id.* at 24. Plaintiff told them that he needed copies and that he needed to use the industrial stapler after the copies were made. He showed them a letter from the United States Supreme Court stating that only documents that were stapled would be accepted for filing. *Id.* at 17, 23. Confronted with plaintiff's request, Wheeler said that plaintiff could either use the law library or he could return to his cell. *Id.* at 24. Plaintiff wanted to use the library, and they admitted him. *Id.* Since he arrived too late to do research, plaintiff only requested that the law librarian, Mr. Thompson, make photocopies of two different sets of documents. SUF 2; *Id.* at 23-24. About five minutes later, while plaintiff was waiting for the copies to be made, defendants Wheeler and Albonico entered the library to escort the prisoners back to their cells, saying they would escort whoever was ready to go. SUF 3; *Id.* at 24, 30. Plaintiff approached them at the door to the library and again asked whether he could use the industrial stapler before returning to his cell. Pl.'s Dep., at 24, 30. He testified that he was not hostile, aggressive or demanding in his demeanor or attitude. SUF at 3; Pl.'s Dep., at 24. Wheeler refused, telling plaintiff that he was going to take plaintiff back to his cell. SUF 4, 5; Pl.'s Dep., at 25. Plaintiff asked to be escorted last, after the other eight prisoners had been escorted, because he wanted to wait for the rest of his copies to be made. SUF 6; Pl.'s Dep., at 25. Wheeler denied his request and announced that he planned to escort plaintiff first. Pl.'s Dep., at 25, 27. Plaintiff said he would not return to his cell without his copies and asked for the

---

[4] It is not clear why, but a building officer, as opposed to an S&E officer, escorted plaintiff to the law library. Pl.'s Dep., at 18, 23.

3

guards' names. *Id.* at 25, 27. He copied Alboinico's name from the guard's name tag. *Id.* at 27. Plaintiff told both Albonico and Wheeler that he intended to file a grievance about Wheeler's refusal to take him to the program office. *Id.* at 32. He then walked away from Wheeler and Albonico over to the counter where Mr. Thomas was making plaintiff's copies. *Id.* at 29. At the same time, he asked other prisoners present whether they saw Wheeler refuse to help plaintiff and invited them to be witnesses on his behalf. *Id.* at 29, 30. He also asked Thomas for his copies. Before Thomas could bring the copies that were done, Wheeler told plaintiff that he had to leave right then. *Id.* at 29. While at the counter, plaintiff wrote down the names of at least two prisoners, Alexander and Sessions. *Id.* at 27, 29, 31.

According to plaintiff, while he was writing Sessions' name,[5] Wheeler rushed plaintiff from behind, hitting plaintiff so hard that Sessions had to jump back. *Id.* at 27, 31. Plaintiff could not see Wheeler at the moment of the attack because plaintiff was at the counter with his back turned. *Id.* at 34. Wheeler grabbed plaintiff by his left arm and plaintiff, who was unable to resist because of the full restrains on him, immediately submitted and went down to the ground. *Id.* at 34-35, 36. Wheeler went down with him, jumped on his back and started pounding plaintiff in the head. *Id.* at 35. Wheeler punched plaintiff in the back of the head at least three to five times, slammed plaintiff's face into the floor and pressed it there. *Id.* at 36-37. While Wheeler was on plaintiff's back, Albonico grabbed plaintiff by the legs, crossed one over the other and jumped on them, pressing down until plaintiff's ankle snapped. *Id.* at 35, 37-38. Plaintiff was in severe pain, and began screaming that his ankle was broken. *Id.* at 38. Plaintiff stated that it felt like Albonico used his knees to apply full pressure to one of plaintiff's legs while they were crossed. *Id.* at 39.

////

---

[5] Twice plaintiff said this occurred while writing the name of fellow prisoner Sessions, and once he said he was writing the name of fellow prisoner Fletcher. Pl.'s Dep., at 27, 29, 31. Whether plaintiff recalls the name of the fellow prisoner whose name he was writing is inapposite for purposes of summary judgment.

4

Apparently because of the commotion in the law library, Sergeant Turner came in. Plaintiff claims that instead of helping plaintiff, Turner jumped on the back of plaintiff's ankles. *Id.* at 40. On Turner's orders, Thomas sounded an alarm and a captain arrived with other officers. *Id.* Albonico went to get ankle restraints, but could not apply them because plaintiff's ankles were so swollen. *Id.* Plaintiff was injured such that he could not walk. *Id.* Therefore, a guard escorted him in a wheelchair. *Id.* X-rays later verified that plaintiff's ankle was fractured. *Id.* Plaintiff estimates that the attack by Wheeler and Albonico alone lasted about 20-30 seconds, and the incident ended about 20-25 seconds after Sgt. Turner arrived. *Id.* at 41.

In addition to a fractured ankle, plaintiff suffered swelling in his temple, and a neck injury.[6] *Id.* at 37, 43-44.

## II. Summary Judgment Standards

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district
> court of the basis for its motion, and identifying those portions of
> "the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any," which it
> believes demonstrate the absence of a genuine issue of material
> fact.

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts. *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter

---

[6] At deposition, plaintiff testified that he was denied medical care for his injuries for about three months. Pl.'s Dep., at 44-45. However, he does not in the complaint claim that his Eighth Amendment right to adequate medical treatment was violated. Therefore, the court does not consider this issue.

5

of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts; e.g., issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Focus on where the burden of proof lies as to the issue in question is crucial to summary judgment procedures. "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the opposing party must establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the claim under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In this regard, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In attempting to establish the existence of a factual dispute that is genuine, the opposing party may not rely upon

6

the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.

Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). However, the opposing party must demonstrate with adequate evidence a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989). The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252. If the evidence presented could not support a judgment in the opposing party's favor, there is no genuine issue. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III. Analysis

As noted above, defendants move for summary judgment only on plaintiff's retaliation claim. Defendants contend that there is no genuine issue of any material fact. Defs.' Mot. for Summ. J., at 6. Plaintiff contends that there is. There are five elements to a retaliation claim: (1) persons acting under color of state law took some adverse action against a prisoner; (2) because (3) the prisoner engaged in protected conduct; (4) resulting in the chilling of plaintiff's First Amendment rights; and (5) the action did not reasonably advance a legitimate penological goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2003). Here, there is no dispute about whether, as guards at a state prison, Albonico and Wheeler acted under color of state law. *See* 42 U.S.C. § 1983; *see Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (state prison employees deemed to have acted under color of state law because they were "clothed with the legitimacy of the government and were purporting to act thereunder."). However, to survive summary judgment, plaintiff must submit evidence that the defendants took some action against him "for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals." *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (per curiam). In this case, plaintiff alleges that the retaliatory act was the use of force by Wheeler and Albonico that plaintiff described in his deposition. In their answer, defendants deny using "excessive or inappropriate force." Defs.' Answer, ¶ 15. However, they do not support their motion for summary judgment with affidavits.[7] In any event, plaintiff alleges in his testimony

---

[7] Defendants rely entirely on the allegations of plaintiff's complaint and his deposition testimony in arguing that there is no genuine issue for trial on plaintiff's retaliation claim. The court notes, however, that plaintiff attached to his complaint several apparently contemporaneous reports written by prison officials, including defendants and Sergeant Turner. According to these reports, defendants were ready to escort prisoners from the law library to their respective buildings. Compl., at 21, 23. Plaintiff approached Wheeler and demanded to be taken to the Program Office to use the industrial stapler. *Id.* Wheeler reported that he refused and plaintiff became angry "and started to talk very bad, demanding me to take him to D-Program to use the industrial stapler." *Id.*, at 21. Albonico reported that Wheeler's refusal upset plaintiff, who then became "argumentative." *Id.*, at 23. Both defendants reported that Wheeler ordered plaintiff to leave the law library, but plaintiff turned and walked away from the exit towards the back of the library. *Id.*, at 21, 24. Wheeler then attempted to secure plaintiff's

8

that Wheeler came at plaintiff from behind, grabbed him by the left arm, and once plaintiff was on the floor Wheeler punched him in the head several times and smashed plaintiff's face into the floor. He also claims that Albonico twisted plaintiff's legs, jumped on them and applied such pressure so as to cause plaintiff to feel his ankle snap, resulting in severe pain and, it appears, a fractured ankle. If his testimony is believed, a reasonable fact finder could conclude that these defendants used excessive force.

The parties also dispute the retaliatory nature of the force used. It is plaintiff's burden to establish a causal connection between the exercise of constitutional rights and the allegedly retaliatory action. *See Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995). Causation may be shown by evidence sufficient for a jury to infer that the defendants' conduct was motivated by the plaintiff's exercise of a protected right. This may consist of direct evidence or of circumstantial evidence. Thus, a plaintiff may prove causation by evidence of the temporal proximity between the plaintiff's exercise of his right and the allegedly retaliatory conduct, or by evidence of a defendant's prior conduct inconsistent with the allegedly retaliatory acts. *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003); *see also Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 751-52 (9th Cir. 2001). Here, the facts testified to by plaintiff show that Wheeler and Albonico knew that plaintiff expressed an intent to file a grievance.[8] Plaintiff

---

compliance by placing his right hand on plaintiff's upper left arm, but plaintiff turned towards him to break free. *Id*. Wheeler then wrapped his arms around plaintiff's "upper torso area and using physical strength, forward momentum, and [] body weight forced" plaintiff to the ground. *Id*., at 21-22. Albonico used nearly identical language to describe how Wheeler took plaintiff to the ground. *Id*., at 24. Both defendants reported that plaintiff landed on his stomach with Wheeler on his back. *Id*., at 22, 24. At this point, plaintiff was kicking his feet. To subdue him, Albonico "placed [his] shins across [plaintiff's] lower extremities utilizing [his] body weight to hold his legs in place." *Id*., at 24. Wheeler, Albonico and Sgt. Turner all reported that Turner held plaintiff's feet until another officer arrived and placed plaintiff in leg irons. *Id*., at 22, 24, 25. Plaintiff testified at deposition that the facts in the report about how he ended up on the floor could not be corroborated by his injuries, and that the language was fabricated, which is typical of reports written by members of the "Green Wall" when they wanted to cover up an unjustified use of force.

[8] Plaintiff's statements to Albonico and Wheeler and his writing of names are protected First Amendment activities.

testified at deposition that he told Wheeler and Albonico that he wanted their names in order to file a grievance about Wheeler's conduct. He copied Albonico's name tag. Moreover, in their presence Plaintiff announced to the other prisoners in the library that he wanted the names of whoever observed Wheeler refusing to take plaintiff to use the industrial stapler. According to plaintiff, he arrived at the law library about 15 minutes before the library was to close. Thus, the entire sequence of events, i.e., plaintiff's expression of intent to file a grievance, writing the names of Albonico and at least one or two prisoners and the attack occurred within about 15 minutes.

      Defendants do not deny the sequence of events or the timing thereof. Plaintiff also testified at deposition that ordinarily, S&E officers would escort prisoners to the Program Office to use the large stapler. This time frame is sufficient for a jury to infer causation between plaintiff's exercise of his rights and the attack by Wheeler and Albonico. *See Pratt v. Rowland*, 65 F.3d at 804-05, 808 (one month between exercise of First Amendment rights and allegedly retaliatory act sufficient to raise question about causation). While plaintiff conceded that he knew of no formal written policy about gaining access to this stapler, there is no evidence to contest plaintiff's evidence about the general pattern and practice in this regard.

      In light of the evidence concerning timing and ordinary prison practice, and the plaintiff's testimony as to the amount and nature of the force used, the court finds that there is a genuine dispute about whether plaintiff's exercise of his First Amendment rights motivated defendants to attack him.

      In addition to causation, plaintiff has the burden of coming forward with evidence that defendants had no legitimate penological interest for their actions. Institutional order and discipline are legitimate penological goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985). No doubt there are circumstances in which some level of force is necessary when a prisoner refuses to return to his cell, which plaintiff arguably did in stating that he refused to leave the library without his copies. The evidence shows that plaintiff was persistent about wanting to use

the industrial stapler in the Program Office and about not wanting to leave the law library without his copies. However, it also shows that he was in waist-chains to which his handcuffed hands were attached by about six inches of chain, and that he did not speak to the officers in a threatening, aggressive or demanding manner. Furthermore, the evidence shows that guards first escort whoever is ready and volunteers to leave, and that they will take prisoners to use the stapler located in the Program Office. Whether others had volunteered in this case, or there was a legitimate reason for refusing to take plaintiff to the Program Office are open questions. Having arrived at the law library, through no fault of his own, with about 15 minutes to obtain photocopies of two stacks of documents and being dependent upon the law librarian to accomplish this task, he was waiting for at least part of the job to be completed. If plaintiff's testimony is believed, there was no justification for the amount of force that was used here. However, whether to credit plaintiff's testimony in this regard cannot be determined on summary judgment.

For all these reasons, the court finds that there is a genuine issue about whether there was a legitimate penological reason for defendants' use of force.

Defendants rely heavily on their contention that plaintiff cannot prevail at trial because their conduct did not chill plaintiff's exercise of his First Amendment rights. In particular, they note plaintiff's concession that he continues to file grievances. However, a prisoner is not required to demonstrate a complete chilling of his First Amendment rights in order to establish a retaliation claim. *Rhodes v. Robinson*, 408 F.3d 559, 568-69 (9th Cir. 2005) (rejecting argument that inmate did not state a claim for relief because he had been able to file inmate grievances and a lawsuit). The retaliation need not have been so effective at curbing a prisoner's First Amendment rights that he was silenced. *Id.* It is enough that a reasonable person would be discouraged or reasonably apprehensive about filing a future grievance. *Id*. at 569 (destruction of inmate's property and assaults on the inmate enough to chill First Amendment rights and state retaliation claim, even if inmate filed grievances and a lawsuit). Given that federal law *requires*

prisoners to file grievances in order to seek redress in the federal courts for alleged constitutional violations occurring in prison, "it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity." *Id.* Therefore, the question is "whether an official's acts would chill *or* silence a person of ordinary firmness from future First Amendment activities." *Id.*, at 568. Therefore, plaintiff's concession that he continues to file grievances is simply not dispositive. Given the nature of the allegedly retaliatory acts in this case, i.e., an attack and severe beating by two guards, the court finds that there is a genuine issue about whether these actions had a chilling effect.

## IV. Conclusion

For all the reasons explained above, the court finds that there are genuine issues of material fact with respect to several elements of plaintiff's retaliation claim. Therefore, defendants are not entitled to judgment as a matter of law. Since defendants did not seek summary judgment on plaintiff's excessive force claim, the parties must prepare for trial on both of plaintiff's claims.

Accordingly, it is hereby recommended that:

1. Defendants' August 1, 2008, motion for summary judgment be denied;

2. Plaintiff be given 30 days to file and serve a pretrial statement; and,

3. Defendants be given 15 days to file and serve a pretrial statement.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections

////

////

1 | within the specified time may waive the right to appeal the District Court's order. *Turner v.*
2 | *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).
3 | Dated: May 13, 2009.

_____
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE